**Eugene PIERCE, Plaintiff–Appellee, Cross–Appellant,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY CO., d/b/a Santa Fe Railroad Co., Defendant–Appellant, Cross–Appellee.**

Nos. 94–3057 and 94–3093.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1995.

Decided Aug. 30, 1995.

H. Nicholas Berberian (argued), Robert J. Kuker, Neal, Gerber & Eisenberg, Chicago, IL, for plaintiff-appellee.

J. Stephen Poor (argued), Kenneth D. Schwartz, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant-appellant.

Before RONEY,[*] FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Santa Fe Railroad ("Santa Fe") appeals from a jury verdict against it on Eugene Pierce's allegation of age discrimination. Santa Fe asserts that Pierce signed a release barring this recovery, that it did not discriminate against him, let alone willfully, and that the court erred in calculating Pierce's front pay award. In his cross-appeal, Pierce maintains that if we vacate the age discrimination verdict, we should remand for reconsideration of his race discrimination claim. We remand for further consideration the issue of whether Pierce executed the release knowingly and voluntarily, affirm, but vacate pending remand, the finding of discrimination and the award of front pay, and reverse the finding of willfulness.

---

[*] The Honorable Paul H. Roney of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

## I.

Eugene Pierce, an African–American, began working for Santa Fe in June, 1977. He held several union posts until March 1, 1988, when Santa Fe promoted him to a nonunion position as a Senior Analyst in its Intermodal Marketing Group. In this job, Pierce received rate proposals from field sales representatives and was responsible for entering data into a computer, analyzing the relevant information, and accepting or rejecting the suggested rate.

In July, 1989, Santa Fe terminated Pierce from his Senior Analyst position. Santa Fe explained to Pierce, then 51 years old, that this action was pursuant to a reorganization/reduction in force of his department. Santa Fe actually may have added Senior Analyst positions and one such spot remained open after Pierce's discharge. Santa Fe asserts that all but two of the slots entailed different duties than Pierce's former job, but Pierce was the only former Senior Analyst not retained. In addition, Santa Fe's 1989 Annual Report stated that its new intermodal department was its "most promising growth area."

Pierce rejected a severance package, including $19,000, that required him to sign a general release of claims against Santa Fe. Instead, Pierce exercised his union seniority rights and became a file room clerk. Two days later a more senior union employee took that job from Pierce, who then accepted a position as an assistant file room clerk. This job paid less than his previous Senior Analyst position and required Pierce to deliver and pick up files from the people now performing his former duties. In November, 1989, Pierce learned that his department was being relocated out of the state, although he had heard rumors to that effect before taking the position. Pierce met with George Pacocha, the director of administration, about his possible eligibility for a one-year severance package if he resigned.

Leighton Broxterman, an employee in Santa Fe's personnel department, approved the one-year deal if Pacocha could complete it within the three business days before Thanksgiving. At trial, Pacocha could not recall why Broxterman imposed this time constraint. Pacocha never informed Pierce that Pierce was not otherwise entitled to this package although Pacocha and Broxterman gave conflicting testimony regarding whether a one-year severance package was standard company practice.

As part of the package, Pacocha presented Pierce with a general release stating:

I further understand that this voluntary resignation constitutes full settlement and release of *any and all claims of any nature, known or unknown,* which I may or might have against said Railway Company, including, but not limited [to], claims which derive from or are based on any aspect of my preceding employment relationship with said Railway Company or my resignation of such employment. I have received over $36,000.00 in exchange for signing this release.

(emphasis added). Before signing the release, Pierce informed Pacocha that he had filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging age and race discrimination from his termination as a Senior Analyst. Pierce asked Pacocha whether the release covered civil rights claims, and the parties agree that in response, Pacocha stated he did not think it did, but rather, only waived bodily injury actions. Pierce also recounted that Pacocha told him he would not receive the severance package unless he signed the release immediately. Pierce, however, asked for and received at least one more day to consider the release. Pacocha said he would consult with Santa Fe's legal department to clarify the scope of the release and suggested that Pierce could also consult an attorney. Pierce instead chose to confer with an EEOC employee, whose advice he did not disclose at trial.

Pacocha testified that when he and Pierce met again, on the Monday following Thanksgiving, he told Pierce that the release would bar his discrimination claim; another Santa Fe employee recounted hearing Pacocha's statement. Pierce stated that the men actually met the day after their initial meeting, the Wednesday before Thanksgiving, and that Pacocha again assured him the release would not cover his discrimination actions. Pierce signed the release, received the money and then, on June 18, 1991, filed the instant action.

The parties consented to disposition by a Magistrate Judge. The Magistrate Judge allowed the issue of whether the release barred Pierce's claims to go to the jury, which found that it did not. The jury further found that Santa Fe had discriminated against Pierce because of his age and awarded Pierce in excess of $47,000 in back pay. The jury further found that Santa Fe had acted willfully and thus doubled Pierce's back pay award. In its advisory capacity, the jury found that Santa Fe had not discriminated against Pierce because of his race, a conclusion also reached by the court. Santa Fe filed a motion for judgment notwithstanding the verdict ("JNOV") (now called judgment as a matter of law), which the court denied. The court then held a hearing on damages and subsequently awarded Pierce $392,482 in front pay and lost benefits. Both parties appealed, raising numerous challenges to the verdicts.

On appeal, Santa Fe argues that the court erred in denying its motion for a JNOV because the release Pierce signed barred these claims and because it did not discriminate against Pierce or do so willfully. Santa Fe also argues that the court erred in calculating front pay. Pierce asserts that if we reverse the jury's verdict, we must remand for reconsideration by the court of his race claim.

## II.

■ We review the court's denial of Santa Fe's motion for judgment notwithstanding the verdict *de novo. Downes v. Volkswagen of America, Inc.,* 41 F.3d 1132, 1139 (7th Cir.1994). We view all evidence and permissible inferences in favor of Pierce and disregard conflicting testimony and determine whether sufficient evidence supported the

jury's verdict that the release did not cover his claims. *King v. Fairman,* 997 F.2d 259, 261 (7th Cir.1993). "A motion for judgment notwithstanding the verdict should only be granted when there can be but one conclusion from the evidence." *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 515 (7th Cir.1993). Pierce's arguments against the validity of the release span both state contract law and federal civil rights law. We address the ramifications of each in turn.

### A.

■ We start by noting that the release, on its face, plainly covers Pierce's claims. It is written in extremely broad terms and its "any and all" language is not ambiguous. *Constant v. Continental Tel. Co.,* 745 F.Supp. 1374, 1380 (N.D.Ill.1990); *see also Lohman v. Morris,* 146 Ill.App.3d 457, 497 N.E.2d 143, 146 (3d Dist.1986) ("any and all" is clear and unequivocal). Pierce asserts that "my previous employment relationship" is unclear because he held more than one position as a Santa Fe employee. While that phrase could be read to mean either his job as an assistant file room clerk or his entire employment relationship with Santa Fe (in our view the most natural reading), in no way does this possible ambiguity affect the clear import of the "any and all ... including, but not limited [to]" language preceding it. The release clearly encompassed Pierce's discrimination claims.

■ Pierce, however, argues that the contract contains an extrinsic ambiguity. We have recognized that parties can "present evidence outside of the contract to show that although the contract appears to be clear to a typical reader of English, anyone who understood the circumstances in which the contract had been intended to apply would know that it does not mean what it seems to mean." *Home Ins. Co. v. Chicago & Northwestern Transp. Co.,* 56 F.3d 763, 768 (7th Cir.1995). In order to protect what parties apparently have bargained for by reducing their agreement to writing, we only allow litigants to introduce objective evidence to show the contract has a different meaning. *AM Int'l, Inc. v. Graphic Management Assoc., Inc.,* 44 F.3d 572, 575 (7th Cir.1995). We permit objective

evidence—that supplied by disinterested third parties such as custom or trade usage—because the parties to a contract have a limited ability to fabricate such information. *Id.* On the other hand, we do not admit subjective evidence—the parties' own self-serving testimony—because it is easily concocted and difficult to verify. *Id.*

■ Pierce's assertion that Pacocha told him the release would not cover his EEOC claim, regardless of its unambiguous, broad language, is exactly the type of subjective testimony we do not allow. Pierce maintains that objective evidence—the fact that he did not sign a release after losing his Senior Analyst position, the fact that he thought he was entitled to the severance package without having to sign the release, and the fact that Santa Fe did not assert the release as a defense before the EEOC—supports his contention. None of this evidence undisputedly bolsters Pierce's story and thus does not alter our decision. *See Cole Taylor Bank v. Truck Ins. Exch.,* 51 F.3d 736, 740 (7th Cir. 1995).

Furthermore, this situation is not properly argued as a case of extrinsic ambiguity. We ordinarily invoke that doctrine to allow parties to show that "they couldn't have meant what they seem to have said," *Matter of Stoecker,* 5 F.3d 1022, 1029 (7th Cir.1993), because of the "context in which the contract had been intended to apply." *Home Ins.,* 56 F.3d at 768. Here, there is no reason to believe that the parties did not assent to what the contract states. Moreover, Pierce actually seems to argue that he and Santa Fe agreed to an idiosyncratic meaning for the release—"any and all" does not refer to all conceivable claims, it alludes only to bodily injury actions. Of course, Santa Fe does not agree with this reading.

### B.

Next, Pierce asserts that he signed the release under duress. He points out that Pacocha gave him only one day to accept the severance package and release. Pierce also maintains that his assistant file clerk position subjected him to humiliation and the possibil-

ity of relocation, which forced him to execute the unfavorable release.

█ Duress is a defense to an otherwise valid contract. *Herget Nat'l Bank v. Theede*, 181 Ill.App.3d 1053, 130 Ill.Dec. 780, 782, 537 N.E.2d 1109, 1111 (3d Dist.1989).

Duress is not shown by the fact that one was subjected to mere annoyance, vexation, personal embarrassment, a difficult bargaining position or the pressure of financial circumstances. There must have been some imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness[es] of another.

*Id.* (internal citations and quotations omitted). Thus, Pierce's humiliation caused by the duties of his new position could not, as a matter of law, constitute duress.

█ Moreover, one cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement. *See Graehling v. Village of Lombard*, 58 F.3d 295, 298 (7th Cir.1995); *Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 314 (7th Cir.1992); *Constant*, 745 F.Supp. at 1384–85. Pierce could have remained in his current position rather than resign; this choice negates any showing of duress.

### C.

█ As a final state law defense, Pierce argues that Santa Fe should be estopped from asserting that the release covers his discrimination actions. To prevail on his estoppel claim, Pierce had to prove that Santa Fe made a misrepresentation that it knew was false and on which it intended him to rely. Pierce also had to demonstrate that he actually relied to his detriment on this misrepresentation and that his reliance was reasonable. *Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1233 (7th Cir.1994). Even assuming all other elements based on Pacocha's statement that the release did not cover Pierce's EEOC claim, the last factor, reasonable reliance, dooms Pierce's estoppel defense.

█ The Illinois defense of fraudulent inducement also requires proof of reasonable

reliance, *see Phil Dressler & Assoc., Inc. v. Old Oak Brook Inv. Corp.*, 192 Ill.App.3d 577, 139 Ill.Dec. 629, 633, 548 N.E.2d 1343, 1347 (2d Dist.1989), so cases discussing reasonableness in that context are instructive to the resolution of our issue. Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation. *Seward v. B.O.C. Div. of Gen. Motors Corp.*, 805 F.Supp. 623, 630 (N.D.Ill.1992). In *Seward*, the court held that Seward could not have justifiably relied on B.O.C.'s oral statement that he could revoke the release at issue when the release did not so state but included an integration clause concerning all promises regarding Seward's resignation. *Id.* at 631; *see Kolson v. Vembu*, 869 F.Supp. 1315, 1322 (N.D.Ill.1994) (Shadur, J.). *But see Griswold v. E.F. Hutton & Co.*, 622 F.Supp. 1397, 1404–06 (N.D.Ill.1985) (Shadur, J.). Estoppel cases have employed similar reasoning. *See Anetsberger*, 14 F.3d at 1233 n. 6; *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 931 (7th Cir.1991); *see also City of Aurora v. Green*, 126 Ill.App.3d 684, 467 N.E.2d 610, 613 (2d Dist.1984) (Parties cannot rely on misrepresentations of law because they are presumed to be equally capable of interpreting the law.); *Jursich v. Arlington Heights Fed. Sav. & Loan*, 110 Ill.App.3d 847, 65 Ill.Dec. 549, 552, 441 N.E.2d 864, 868 (2d Dist.1982) (Plaintiff could not accept "defendant's allegedly false construction of the terms of the mortgage" because "the erroneous interpretation of a contract constitutes a mistake of law for which the law affords no remedy.") (internal citation omitted); *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 521 (7th Cir.1986) (Under Indiana law, a misrepresentation about the meaning of a document is not actionable.); *cf. Cange v. Stotler & Co.*, 913 F.2d 1204, 1208 (7th Cir.1990) (investor reasonably relied on broker's assurances that his account would be credited for unauthorized sales, even though account statements disclosed no such reimbursements, where broker had authority to make such changes).

█ We can see no difference between *Seward*, in our view correctly decided, and this case, where the contract at issue clearly

encompasses all types of claims but Santa Fe allegedly stated that the release only covered bodily injury actions. Pierce should have understood the meaning of the agreement. He did not, and after questioning its coverage, chose to rely on Pacocha's interpretation even though nothing in the release supported that reading. Pierce's reliance was unreasonable as a matter of law.

### D.

Pierce also argues that notwithstanding state law defenses, he did not knowingly and voluntarily sign a release, and that therefore the release should not be upheld. Employees may waive their federal ADEA rights in private settlements with their employers, provided that their consent to a release is both knowing and voluntary. *See Alexander v. Gardner–Denver*, 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1022 n. 15, 39 L.Ed.2d 147 (1974) ("In determining the effectiveness of any waiver, a court would have to determine at the outset that the employee's consent to the settlement was voluntary and knowing."); *Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368 (7th Cir.1989). Courts disagree as to the appropriate source of law to be used in determining whether a release of federal civil rights is knowing and voluntary. *See Riley*, 881 F.2d at 371. As we recently noted in *Fortino v. Quasar Co.*, 950 F.2d 389, 394–95 (7th Cir.1991), courts have looked to both federal and state law. The Second, Third, Fifth, Tenth and Eleventh Circuits have applied a federal "totality of the circumstances" approach in determining whether a plaintiff knowingly and voluntarily executed a release of claims. *See Gormin v. Brown–Forman Corp.*, 963 F.2d 323, 327 (11th Cir.1992); *Torrez v. Public Serv. of New Mexico, Inc.*, 908 F.2d 687 (10th Cir. 1990); *O'Hare v. Global Natural Resources, Inc.*, 898 F.2d 1015, 1016 (5th Cir.1990); *Stroman v. West Coast Grocery Co.*, 884 F.2d 458, 461 (9th Cir.1989) (Title VII); *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 401–02 (2d Cir.), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); *Coventry v. United States Steel Corp.*, 856 F.2d 514, 521–22 (3d Cir.1988); *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1172 (5th Cir.), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976). The Fourth, Sixth and Eighth Circuits, on the other hand, have applied general principles of contract construction. *See O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 362 (4th Cir.1991); *Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 541 (8th Cir.) (ADEA), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *Runyan v. National Cash Register Corp.*, 787 F.2d 1039 (6th Cir.) (en banc), cert. denied, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). Under this view, the discussion is over once we determine that the release passes state contract law muster. Alternatively, the federal approach requires a detailed look at the circumstances surrounding execution of the release in addition to, rather than as a replacement for, ordinary contract considerations.

In *Riley v. American Family Mut. Ins. Co.*, this court strongly suggested that it would adopt the totality of the circumstances approach, but was not required to under the facts of the case. 881 F.2d at 374; *see also Fortino*, 950 F.2d at 395. As both *Riley* and *Fortino* recognized, some cases in this circuit have indicated that the validity of a release of Title VII rights is governed by federal principles, *see Taylor v. Gordon Flesch Co.*, 793 F.2d 858 (7th Cir.1986); *Lyles v. Commercial Lovelace Motor Freight, Inc.*, 684 F.2d 501, 504 (7th Cir.1982), while other cases interpreting such settlements apply standard state contract law tenets. *See Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 474–76 (7th Cir.1986); *see also Air Line Stewards Ass'n v. American Airlines, Inc.*, 763 F.2d 875, 877 (7th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).

*Riley* was the first case in which we, at some length, discussed the totality of the circumstances approach to determining whether a waiver of federal civil rights was knowing and voluntary. In *Riley*, we held that a plaintiff who was represented by counsel and negotiated a release would be presumed to have made an effective waiver. In dicta, we then commented:

> where the language of the waiver is unambiguous, it is unnecessary to create a dis-

tinct federal body of law to interpret plaintiff's release of federal rights. *However, consonant with the Supreme Court's directive in* Alexander, *some inquiry must be made to determine that plaintiff's assent to the unambiguous language was knowing and voluntary.*

881 F.2d at 373 (emphasis added). We further elaborated that where certain circumstances were present, such as a lack of representation by counsel, the limited education of an employee, and the use of a standard form release prepared by defendant company, "the court may need to inquire beyond the state law requirements for a valid contract to fulfill the remedial policy of Title VII and prevent the involuntary or uninformed compromise of federal rights." 881 F.2d at 374. In *Fortino*, we noted *Riley's* suggestion, but did not take a position because the plaintiff lost under all theories. 950 F.2d at 395. *Fortino* acknowledged, however, that "[s]ome day we may have to choose among the ... approaches...." *Id.; see Fleming v. U.S. Postal Serv. AMF O'Hare*, 27 F.3d 259, 260 (7th Cir.1994). The facts of this case require we do so.

 While we recognize the critical role that the plain language of the contract plays, our inquiry into knowledge and voluntariness cannot end there. The "[c]reation of a federal rule rather than absorption of a state rule is appropriate where ... the rights of the litigants and the operative legal policies derive from a federal source." *See Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir.1981). The totality of the circumstances approach is consistent with the strong congressional purpose underlying the ADEA to eradicate discrimination in employment. *Bormann*, 875 F.2d at 403; *see also Watkins*, 530 F.2d at 1172 ("To assume that, notwithstanding strong evidence to the contrary, a signature implies understanding is to allow a rule of contract law to play too salient a part in the administration of a remedial civil rights statute."). Given the federal policy underpinnings, *Alexander*'s direction, and

the bearing and reasoning of *Riley*, we agree with the majority of circuits and now conclude that when an employee challenges his assent to a release as not being knowing and voluntary, a court must examine the "totality of circumstances" surrounding the execution of the release.

 Like the other circuits that currently employ the federal totality approach, a court should look to a number of factors to assess the validity of a particular release, including, but not limited to: (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney;[1] (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part. *See Gormin*, 963 F.2d at 327; *O'Shea*, 930 F.2d at 361; *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160, 162 (8th Cir. 1990); *O'Hare*, 898 F.2d at 1017; *Stroman*, 884 F.2d at 462; *Bormann*, 875 F.2d at 403; *Coventry*, 856 F.2d at 523.

 Recognizing the applicability of the totality of the circumstances approach, we now must address *when* courts make this inquiry. A court need not apply the totality of the circumstances approach in every case involving a release. The Supreme Court noted in *Alexander* that "[i]n determining the effectiveness of any waiver, a court would have to determine *at the outset* that the employee's consent to the settlement was voluntary and knowing." 415 U.S. at 52, 94 S.Ct. at 1022 (emphasis added). Implicit in this concept is that the plaintiff first raise a challenge to his consent. If an employee

---

1. We have previously held that a plaintiff who executes a release pursuant to the advice of independent counsel, or a party whose attorney actively negotiates the release, is presumed to have executed the document knowingly and voluntari-

ly absent claims of fraud or duress. *Riley*, 881 F.2d at 368. Although we are not confronted with these facts in that instant case, nothing in our opinion should be read as altering these statements.

never disputes the knowing and voluntary nature of his release (and merely, perhaps, raises traditional state law defenses to the validity of the contract), a court is not required to consider the totality of the circumstances. To hold otherwise is to ignore another important federal policy: the encouragement of voluntary settlement of claims. Thus, after the employer raises the existence of a release as a defense to a discrimination suit, the burden rests on the plaintiff to challenge specifically his voluntary and knowing consent to the release. This is, of course, in addition to any other contentions the plaintiff may or may not make, including challenges to the formation of the contract, such as offer, acceptance or consideration, or other defenses, such as duress or fraud. It is only once the plaintiff has raised such a "totality" challenge—if and only if there is a valid one to be raised—that a court must turn to it. Moreover, not every allegation that a waiver was not knowing and voluntary properly reaches the jury. A bald assertion of misrepresentation by the employer, standing alone, is legally insufficient.

In the instant case, it is not apparent whether Pierce ever asserted that this consent to the release was not knowing and voluntary. After Pierce filed suit, Santa Fe defended by, in part, asserting that Pierce had signed a valid release of any claims he had against the company. Pierce challenged the contract for lack of consideration, maintained that he signed the contract under duress, and claimed that Santa Fe should be estopped from asserting that the release covered these claims. However, the court instructed the jury that Santa Fe had to prove that Pierce's execution of the release was knowing and voluntary, but it is clear that neither the parties nor the court reflected upon whether that requirement encompasses the totality-of-the-circumstances inquiry. In addition, the jury was given no direction as to the meaning of "knowing and voluntary."

 In that we are explicitly adopting this approach for the first time, we will not preclude consideration of this issue despite its less than complete treatment before the district court. We believe that the trial judge, and possibly a new jury, rather than this court, should determine whether the release was knowing and voluntary. We thus remand for further consideration.[2] If it is found that Pierce's consent was knowing and voluntary, his discrimination claims are barred. However, if his consent was not knowing and voluntary, the release is not valid and we direct the court to reinstate the jury verdicts and damages consistent with our discussion below.

### III.

We now turn to Santa Fe's challenges to the finding of age discrimination, willfulness, and the court's award of front pay in order to avoid the need to reappeal such severable issues if Pierce did not knowingly and voluntarily execute the release.

### A.

 Our review of the record convinces us that Pierce presented sufficient evidence from which a reasonable jury could have concluded that Santa Fe discriminated against him because of his age. Santa Fe asserted that it terminated Pierce because he was the least qualified employee involved in a reduction in force, not because of his age. Evidence demonstrated, however, that additional Senior Analyst positions existed after the reorganization and that one such position remained unfilled after Pierce's discharge. While Santa Fe maintained that these positions entailed different responsibilities and were thus not the same positions, the jury could disregard this testimony in light of the fact that Santa Fe could produce no documentary evidence in support of that argument, it retained all other former Senior Analysts, and that Pierce possessed some

---

**2.** Santa Fe also argues that by failing to tender back the consideration for the release, Pierce ratified it. See Fleming, 27 F.3d at 261. We noted in Fleming, however, that the general tender requirement has several exceptions, including a lack of consideration. Id. at 262. Here, where Pierce asserted that the release did not cover his claims because of Santa Fe's misrepresentations, the situation falls within an exception; his failure to return the consideration thus does not constitute a ratification.

experience with the duties needed for the last opening.

In addition, Pierce presented a document demonstrating that Santa Fe hired seven people, all in their twenties, as Senior Analysts after it terminated Pierce. Santa Fe argues that the court erred in admitting this exhibit because without statistics regarding the relevant applicant pool or qualifications of those employees, the list is not probative while being very prejudicial. *See Kier v. Commercial Union Ins. Co.,* 808 F.2d 1254, 1258 (7th Cir.), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987); *see also Knapp v. Eagle Property Management Corp.,* 54 F.3d 1272, 1280 (7th Cir. 1995); *Futrell v. J.I. Case,* 38 F.3d 342, 348 (7th Cir.1994). The admission of evidence is within the discretion of the court and we will reverse its decision only upon a showing of an abuse of the discretion. *Knapp,* 54 F.3d at 1280. This exhibit demonstrates not only that Santa Fe hired younger people to fill the position Pierce previously held or allegedly could fill (see discussion below), *see Ayala v. Mayfair Molded Prod. Corp.,* 831 F.2d 1314, 1320 (7th Cir.1987), but also that Santa Fe did so at the same time it was allegedly pursuing a reduction in force. This document was thus relevant to Pierce's contention that no such reduction occurred and that age may have been the true reason for Pierce's discharge. The court took care to limit the information contained in the document and we cannot conclude that the court abused its discretion in admitting this exhibit.

Santa Fe correctly asserts that Pierce's self-serving testimony that he was performing well cannot by itself demonstrate that Santa Fe's explanation that it discharged Pierce because he was the least qualified Senior Analyst is merely pretextual. *See Aungst v. Westinghouse Elec. Corp.,* 937 F.2d 1216, 1220 (7th Cir.1991). However, Santa Fe never maintained that it fired Pierce "for cause." Instead, it consistently argued that it fired him as part of the reorganization, which, as we have held, the jury could reasonably believe did not occur.

Moreover, Pierce presented evidence from which a reasonable jury could infer that Zajac and Mitchell did not actually know or care about Pierce's qualifications when they made the decision to fire him. Zajac testified that in choosing which Senior Analysts to retain, he and Mitchell did not discuss their individual qualifications and did no comparison of abilities. Indeed, Zajac testified that Pierce did not have the necessary computer skills for the new positions, but then admitted that he was unaware of Pierce's computer experience during the selection process. While Mitchell stated that he knew about Pierce's performance, at his deposition he could not recall much of what he testified to at trial. The jury therefore could reasonably infer that Mitchell and Zajac never really considered Pierce for a position and also could disregard Zajac's testimony that the younger people hired after Pierce's termination possessed skills Pierce did not.

In *Jang v. Biltmore Tire Co.,* 797 F.2d 486, 489 (7th Cir.1986), the defendant asserted it had fired Jang not because of his age but because he could not keep up with the company's growing needs. In response, Jang argued only that he was a good employee in the past and that the jury should have been allowed to determine credibility issues. We affirmed a directed verdict for the defendant because Jang had failed to produce specific evidence to show that the defendant's reason was merely pretext. *Id.* Here, Pierce elicited testimony from Mitchell and Zajac showing that they did not actually consider his abilities for positions in the new department. This case is thus more analogous to *Christie v. Foremost Ins. Co.,* 785 F.2d 584, 586–87 (7th Cir.1986), where we upheld a verdict for the plaintiff who had shown that the company's decision that another employee was superior was suspect and that the company may not have been reducing its workforce.

Viewing the evidence as a whole and in favor of Pierce, we conclude that the jury could have reasonably concluded that a reduction in force did not really occur and that Santa Fe did not truly consider Pierce for any of the positions available in the reorganized department. Although this finding of pretext and Pierce's *prima facie* case do not compel the jury's verdict, they do adequately support that decision.

## B.

Santa Fe next argues that even if it discriminated against Pierce, it did not do so willfully. An employer acts willfully if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 128, 105 S.Ct. 613, 625, 83 L.Ed.2d 523 (1985); *see also McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988) ("willful" ADEA violations require more than negligent conduct).

Pierce rested his willfulness argument on the following facts: 1) Mitchell, a member of senior management, attended staff meetings at which employment discrimination issues were discussed, although he denied knowing about the ADEA, and 2) Pacocha wrote "Risk" next to Pierce and another, 39 year old, employee's names on a list compiled at the time the termination decision was made. Simply being aware of the ADEA, however, cannot turn every violation into a willful one. In *Futrell,* 38 F.3d at 349, we held that the decisionmaker's admission that he knew that age discrimination was illegal and his notation that a certain severance package would reduce the chances of a discrimination suit would not suffice to show willfulness. In that case, other evidence allowed an inference that the defendant knew its conduct violated the ADEA and attempted to conceal that fact. *Id.* Here, while Pacocha could not recall why he wrote "Risk" next to Pierce's name, neither Mitchell nor Zajac testified to ever seeing this document and Pacocha only stated that he could not recall whether he was asked for input into the decision regarding Pierce. This record does not support an inference that Mitchell and Zajac simply rubber stamped Pacocha's possibly discriminatory motive, especially because they retained the other employee who received a similar notation. *See Shager v. Upjohn Co.,* 913 F.2d 398, 406 (7th Cir.1990) ("If the [decisionmaking] Committee was not a mere rubber stamp, but made an independent decision to fire Shager, ... there [would] be no ground for a finding of willful misconduct" based on another supervisor's age bias."). We there-fore reverse the finding of willful discrimination and the corresponding award of damages.

## C.

Finally, Santa Fe argues that the court relied on impermissibly speculative evidence in calculating its award of front pay. We review the court's decision here for an abuse of discretion. *Downes,* 41 F.3d at 1141.

The court awarded Pierce ten years of wages and benefits after concluding that "of all the plaintiffs [it had] seen, Mr. Pierce was as likely as any and probably more likely than most to work to retirement if he had had the ability to do that" because his job was of "immense importance" to him and was "the main source of his sense of who he was and his pride." Although Santa Fe argues that a court cannot simply base an award of front pay on the plaintiff's own stated intentions, *see Hybert v. The Hearst Corp.,* 900 F.2d 1050, 1056 (7th Cir.1990), the court did not do so here. Rather, the court heard other evidence including the fact that Santa Fe's normal retirement age was 65 and an employee would receive reduced retirement benefits if he resigned before that time. While only ⅛ of Santa Fe's employees actually worked to that age, the court gave specific reasons why it believed Pierce would have been one of those employees. In addition, the award fell well within Pierce's 72.8 year life expectancy. Santa Fe asserts that the court should have reduced its award because of the corporation's shaky future, but its evidence to that effect—a failed merger two years prior to Pierce's termination and one newspaper article about a possible future merger—does not demonstrate that the court abused its discretion. *Cf. Downes,* 41 F.3d at 1143 (proper to award three years of front pay although defendant had reduced its workforce by 60%, including three of the seven positions plaintiff held, and was restructuring—court had refused to award the full eight years the expert had calculated); *Tennes v. Com. of Mass., Dep't. of Revenue,* 944 F.2d 372, 381 (7th Cir.1991) (no abuse in refusing front pay where defendant had high

turnover rate and plaintiff had poor employment record).

■ Nor do we think that the court erred in failing to reduce the award to reflect Pierce's marketable skills or the fact that he could have earned $26,000 per year as an assistant file room clerk. Pierce actively pursued comparable employment but had been unable to find anything other than minimum wage (or lower) jobs during the three and one-half years since his discharge. We cannot conclude that the court acted unreasonably in assuming that Pierce would not find a similar job in the future. We note that the court properly deducted Pierce's expected minimum wage earnings from the award.

■ In addition, the court specifically found that the assistant file clerk position caused Pierce great humiliation so he should not have been forced to keep that job or face a reduction of this award. A court need not order reinstatement, see *Downes*, 41 F.3d at 1141, and we do not think this court abused its discretion by finding that Pierce did not have to accept an embarrassing and less fulfilling position with the same company that discriminated against him.

As to Santa Fe's final contention, that the court should have reduced the award to reflect the fact that it might be excludable from Pierce's income for tax purposes, we note that since oral argument the Supreme Court has held, consonant with our decision in *Downey v. Commissioner of Internal Revenue*, 33 F.3d 836, 840 (7th Cir.1994), that such awards are taxable. *Commissioner of Internal Revenue v. Schleier*, —— U.S. ——, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995).

Therefore, we vacate the jury's verdict and the court's award of front pay pending a remand on the issue of whether Pierce executed the release knowingly and voluntarily. If the court determines that Pierce presented enough evidence that the question should be sent to the jury and the jury concludes that Pierce did not, under the totality of the circumstances, execute a knowing and voluntary waiver of his civil rights, the court should

reinstate the verdict in conformance with this opinion. If not, the verdicts will remain vacated.[3]

VACATED and REMANDED WITH DIRECTIONS.

RONEY, Circuit Judge, concurring in part and dissenting in part.

Reluctantly, because Judge Flaum has written a well-reasoned opinion for the Court and I agree with much of it, I dissent from the failure to affirm the district court's decision to let stand the jury verdict as to liability for age discrimination. First, I think there were extrinsic facts sufficient to permit the admission of evidence that Pierce would not have signed the release if it was intended to bar his age discrimination claim. Second, I think the evidence supports the jury's decision on a special verdict form: "Does the Release executed by plaintiff bar these claims?" The jury answered: "No."

Pierce terminated two jobs with Santa Fe, not one. His discrimination claims are based on his earlier discharge as a Senior Analyst, and are not based on his resignation from his final job with Santa Fe as an Assistant File Clerk for which he received termination pay.

Pierce successfully asserted to the district court that since he has held several different positions while at Santa Fe, the clause "my preceding employment relationship" in the release became ambiguous. Was it the immediate employment relationship, or every employment relationship? If the general language of the release would carry the day, what is the significance of the specific reference to an employment relationship? Pierce squarely rejected the severance payment and release that he was offered when he was fired from the Senior Analyst position. Mr. Pacocha, who dealt with Pierce on behalf of the employer, admittedly told him at first that he did not think the release here involved covered Pierce's EEOC complaint. Pacocha disputes Pierce's testimony that this was repeated at the time of the release, but that factual issue was a jury question. It is clear that no change in language was sug-

---

**3.** Because we accept the jury's finding of age discrimination, we do not need to address

Pierce's cross-appeal.

gested by the employer to remove doubt. Nor did Santa Fe ask for the dismissal of the EEOC action or, apparently, even raise the release in response to Pierce's EEOC claim until after the filing of this lawsuit. Pacocha testified that the discrimination claim was not considered when the amount to be paid for the release was determined.

Contrary to the Court's view, I think the use of parol evidence here was properly allowed pursuant to the "extrinsic ambiguity" doctrine, which permits for the admission of parol evidence, when, despite the fact that a "contract seem[s] clear on its face, [it, nonetheless, implicates] certain background facts [that] show that its plain meaning is not its true meaning—that the parties couldn't have meant what they seem to have said, that they must have been using words in a special way." *Matter of Stoecker*, 5 F.3d 1022, 1029–30 (7th Cir.1993). At the very least, it seems to me, the issue is close enough to let stand the decision of the district court, generally granted some latitude in evidentiary matters.

Moreover, as the Court has noted, in the civil rights context, the Court must determine whether the release was entered into "knowingly and voluntarily." *Riley v. American Family Mutual Insurance Co.*, 881 F.2d 368, 373–74 (7th Cir.1989). Voluntariness and knowledge may be called into question where, as here, a "plaintiff was not represented by counsel and possessed a limited education, executed a standard general release form prepared by the employer, or was unable to appreciate the consequences of the release." *Id.* at 374 (citations omitted).

Among other instructions, the jury was told that the release would not bar the discrimination claims if the parties did not contemplate waiving the previously asserted discrimination claims, and that Santa Fe had the burden of proving that Pierce executed the release knowingly and voluntarily.

We cannot be sure what ground the jury relied upon in answering the special verdict question that the release did not bar the claim, but with the proper admission of evidence and with proper instructions, it seems to me that the district court's decision not to set aside the jury verdict as to liability should be affirmed.

I concur in the way that the Court's opinion has decided the other issues on appeal.