In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4790

JAMES DILLARD,

*Plaintiff-Appellant,*

*v.*

STARCON INTERNATIONAL,
INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 9408—**Arlander Keys**, *Magistrate Judge.*

ARGUED SEPTEMBER 22, 2006—DECIDED APRIL 18, 2007

Before EASTERBROOK, *Chief Judge,* and KANNE and
SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* James Dillard sued his former
employer, Starcon International, Inc., for racial discrimi-
nation. With the discovery deadline looming and scheduled
depositions on the horizon, Starcon initiated settlement
discussions. These talks produced oral agreement on key
terms, including a cash payment and reinstatement. New
points of contention arose, however, when Starcon pro-
vided Dillard with a proposed written agreement. Dillard
objected to certain provisions Starcon now sought to
introduce that had not been previously discussed. Starcon
thought these new disputes did not undo the oral agree-

ment the parties had already hammered out and moved to enforce the oral settlement. Dillard denied that any final agreement had been reached because the parties had not ironed out several points first raised in the written agreement. The presiding magistrate judge granted Starcon's motion, concluding that the parties had achieved a meeting of the minds on the material terms of the settlement. Dillard appeals and we affirm.

## I. Background

Dillard began working for Starcon, an Illinois-based mechanical contracting company, as a "B-Mechanic Apprentice" in 1996. Over the next several years, he worked in several positions at various work sites and eventually obtained "B-Welder" status. In July of 2003 at a Citgo Refinery site in Illinois, Dillard made a welding error by using the wrong welding rod on a pipe. When Dillard notified Starcon of his mistake, the company initiated disciplinary and remedial actions. Starcon removed Dillard from the job site and revoked his B-Welder certification. Starcon also proposed a plan whereby Dillard would be assigned to a different job site, placed under the supervision of a mentor, and tested in the future to reacquire his B-Welder status. When Dillard refused to be demoted and comply with this corrective plan, Starcon terminated his employment.

Dillard filed a charge of discrimination with the Illinois Department of Human Rights. He alleged he had been the target of racial insults by coworkers and supervisors, beginning in 2000 while he was at an Exxon Mobil site and continuing through his transfer in 2002 to the Citgo Refinery site. He alleged that when he complained to his supervisors, he was told he would be laid off if he pressed the matter. He also claimed Starcon assigned him work inferior to his training. After the Equal Employment

Opportunity Commission ("EEOC") issued a right-to-sue notice, Dillard filed suit against Starcon in federal court, bringing claims for hostile work environment, retaliation, retaliatory discharge, and racial discrimination.[1] The district court transferred Dillard's case to a magistrate judge.

On March 17, 2005, with discovery soon to close, Starcon's attorney initiated settlement discussions. Starcon first offered Dillard $40,000 and reinstatement as a B-Welder if he passed the requisite welder's test. In return Starcon asked Dillard to dismiss his suit and release any claims against Starcon. Because it did not want to waste time or money unnecessarily taking depositions scheduled for the following week, Starcon asked Dillard for a response to its offer no later than March 21, 2005.[2]

One day later, on March 18, 2005, Dillard countered by asking for $75,000 cash, C-Welder pay while he was training for his B-Welder test, two opportunities to pass the B-Welder test, one month of training for the B-Welder test, and employment at a Chicago-area work site. Later that same day, Starcon responded with an offer of $45,000, A-Mechanic pay during Dillard's training period (because the C-Welder position no longer existed), payment for training as long as Dillard maintained a B average in his course, and reinstatement at least initially at a Chicago-area site as long as work existed there (with flexibility to be assigned to other locations in the future). Though there is a discrepancy in the record on this point, Starcon

---

[1] The presiding magistrate judge subsequently dismissed Dillard's retaliatory discharge count as beyond the scope of his EEOC charge.

[2] The parties identify Starcon's negotiation deadline variously as March 21 or March 20.

also apparently agreed to give Dillard two chances to pass the B-Welder test. That same day, Dillard's counsel informed Starcon that its terms were acceptable—except Dillard wanted a $65,000 cash payment.[3] Starcon answered by upping its cash payment offer, now proposing a $50,000 payment. Again, Starcon gave Dillard until March 21, 2005, to take or leave this final offer.

More discussion of the cash payment followed. On March 20, 2005, Dillard's counsel advised Starcon that Dillard would not accept less than $65,000. Later that day, Starcon acquiesced on this point. In a telephone call, Starcon's counsel confirmed the $65,000 payment and the other terms the parties had previously agreed to and offered to prepare a written draft of the agreement.

Up to this point, the parties had orally agreed to the following terms: (1) Dillard would release Starcon from liability; (2) Starcon would pay Dillard $65,000; (3) Starcon would reinstate Dillard as an A-Mechanic; (4) Starcon would give Dillard an opportunity to train and retest for B-Welder status; (5) Starcon would provide Dillard with B-Welder training and pay for this training if Dillard maintained a B average; (6) Dillard would have two opportunities to pass the B-Welder test; and (7) Dillard would be reinstated at a Chicago-area work site, though he would remain open to future transfers to other locations.

Between March 23, 2005, and March 31, 2005, the parties exchanged drafts of a written agreement. Each draft included various terms that the parties had not

---

[3] Dillard claims his request for $65,000 was made in response to Starcon's offer of $45,000. In its briefing Starcon makes no mention of this offer. Instead, Starcon represents that Dillard's request for $65,000 was in response to its original offer of $40,000.

previously discussed. Starcon's first draft included provisions related to: a release of all Dillard's future claims against Starcon; a promise by Dillard not to partake in future investigations against Starcon; a damages provision if Dillard should breach the agreement; a confidentiality clause; a nondisparagement clause; designation of Dillard's employment as at-will; Dillard's adherence to all Starcon procedures and policies; and a reservation of rights by Starcon to discipline or lay off Dillard in the future.

Dillard found many of these new provisions objectionable. In particular, Dillard wanted the unilateral release, nondisparagement, and confidentiality provisions to be mutual. He rejected the provision specifying that his employment would be at-will and the provision regarding compliance with unspecified policies and procedures. In addition, Dillard would not agree to refrain from assisting in future investigations or to pay liquidated damages in the event of a breach of the agreement. Dillard also said he would not sign the document because it represented that he had been given twenty-one days to consider the settlement when no such time period had been provided.

Beyond noting these objections, Dillard proposed his own additions to Starcon's draft. Dillard wanted Starcon to reemploy him within seven days of receiving his cash payment, establish his rate of pay at the level of an A-Mechanic, give him credit for the time he was unemployed towards the calculation of his benefits and seniority, secure an Illinois work site unless no such jobs were available, increase his compensation when he passed the B-Welder test, secure the A-Mechanic position if he failed the B-Welder test at least two times, and make him terminable only for just cause.

The parties quibbled over these points and others. Starcon explained to Dillard that his request for termina-

tion only upon "just cause" was in conflict with the employment status of every other Starcon employee and indeed, with Dillard's own prior employment with the company. Starcon remained firm in its insistence that Dillard agree not to assist others in investigations of Starcon and accept a clause providing for a monetary penalty in the event of breach. And Starcon claimed it could not agree to reemploy Dillard within a determinate period of time given his demand for an A-Mechanic position in Illinois. Dillard, for his part, now requested a *net* settlement payment of $65,000. (Despite the explanations of his counsel, Dillard contended he did not understand that the original offer of a cash payment was a gross figure.)

At a settlement conference before the magistrate judge on May 25, 2005, Starcon asserted that the parties had reached an oral agreement on all material terms of the settlement and that the disputes over the terms of the written agreement were immaterial to the enforceability of the oral settlement. On June 15, 2005, Starcon filed a motion to enforce the oral settlement. The magistrate judge granted Starcon's motion, finding that the parties orally agreed to the following terms: (1) Starcon would pay Dillard $65,000; (2) Dillard would be reinstated as an A-Mechanic; (3) Starcon would pay for Dillard's B-Welder training provided he maintained a B average; (4) Starcon would give Dillard two opportunities to pass the B-Welder test; and (5) Dillard would be reinstated in the Chicago area for the time being.

The magistrate judge held that the parties had reached a meeting of the minds on all material terms of their agreement. The court pointed to objective, undisputed evidence to support this conclusion. For one thing, the parties' initial oral negotiations whittled matters down to the parties' dispute about the cash payment, which was finally settled at $65,000. At that point Dillard's

counsel did not suggest that other important matters needed to be ironed out. The court also noted the looming March 21 deadline set by Starcon under which the negotiations were being conducted. The magistrate judge found that on that date both parties understood their agreement to be final; Dillard did not make his acceptance contingent on approval of a written instrument. The court concluded the oral agreement was sufficiently definite on all material terms and the disputes that subsequently arose over the written agreement "center[ed] upon non-material terms." Accordingly, the court ordered the oral settlement enforced.

## II. Discussion

We review "a district court's decision to enforce a settlement agreement for abuse of discretion." *Hakim v. Payco-Gen. Am. Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001); *see also Carr v. Runyan*, 89 F.3d 327, 331 (7th Cir. 1996); *Wilson v. Wilson*, 46 F.3d 660, 663-64 (7th Cir. 1995). Dillard argues that the case law in this circuit leaves open the possibility that our review should be de novo. We have previously considered such an argument and rejected it. *See Hakim*, 272 F.3d at 935; *Wilson*, 46 F.3d at 663-64.

There is some confusion over whether federal or state law should guide the analysis of the parties' negotiations and agreement. In the district court, Dillard argued that federal law should apply. On appeal, he argues that state law controls. Starcon has covered its bases by arguing its position under both federal and Illinois law. The magistrate judge did not make a choice, noting that "Illinois and federal law do not differ significantly with regard to the formulation and enforcement of oral settlement agreements." This observation is correct as far as it goes. *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487,

490 (7th Cir. 2002), noted that there has been "uncertainty" in circuit case law "over whether state or federal law would govern a suit to enforce a settlement of a federal suit" but that the uncertainty "has been dispelled; it is state law." *Lynch* further noted that oral settlements are enforceable under Illinois law, and this is "the general rule, not something peculiar to Illinois." *Id.*

The holding in *Lynch* flowed from the Supreme Court's decision in *Kokkonen v. Guardian Life Insurance Co.*, 511 U.S. 375, 380-82 (1994), which established that a settlement of a federal claim is enforced "just like any other contract" under the state law of contracts, "unless it is embodied in a consent decree or some other judicial order or unless jurisdiction to enforce the agreement is retained." *Lynch*, 279 F.3d at 489 (citing *Kokkonen*, 511 U.S. at 380-81). If federal law applied, a suit to enforce the settlement "would arise under federal law and thus be within the jurisdiction of the federal court (even if diversity were absent), contrary to *Kokkonen*." *Id.* at 490.

Although *Lynch* held that the issue of whether parties have entered into an enforceable settlement of a federal claim is governed by state law, in the employment discrimination context, a requirement that the settlement be "knowing and voluntary" has been added as a matter of federal law because of the important "federal policy underpinnings" of employment discrimination law.[4] *Pierce*

---

[4] *Lynch* is in tension with an oft-cited earlier decision of this court, *Taylor v. Gordon Flesch Co.*, which held that "federal law governs the enforceability of settlements in Title VII actions." 793 F.2d 858, 862 (7th Cir. 1986). *Lynch* was not an employment discrimination case and did not mention *Taylor*. However, in light of *Lynch* and other circuit case law such as *Pierce v. Atchison, Topeka & Santa Fe Railway Co.*, 65 F.3d 562, 571 (7th

(continued...)

*v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir. 1995). Whether a settlement of an employment discrimination claim was entered into "knowingly and voluntarily" is determined by the "totality of the circumstances." *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974); *Pierce*, 65 F.3d at 571. Dillard makes only a superficial claim of involuntariness and does not develop the argument. He does not claim, for example, that the oral agreement was the result of mistake or accident or that he was under duress or coerced to assent to it. *See Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 373 (7th Cir. 1989). His claim of involuntariness simply repeats his primary argument that the parties never achieved a meeting of the minds, which is a challenge to the elements of contract formation and is governed by state law.

Oral settlement agreements are enforceable under Illinois law if "there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Wilson*, 46 F.3d at 666 (quoting *Brewer v. Nat'l R.R. Corp.*, 628 N.E.2d 331, 335 (Ill. App. Ct. 1993)). The essential terms must be "definite and certain" so that a court can ascertain the parties' agreement from the stated terms and provisions. *Quinlan v. Stouffe*, 823 N.E.2d 597, 603 (Ill. App. Ct. 2005). Whether a "meeting of the minds" occurred depends on the parties' objective conduct, not their subjective beliefs. *Paxton-*

---

[4] (...continued)
Cir. 1995), *Taylor*'s invocation of federal law must be understood as limited to the federal requirement that settlement agreements in employment discrimination cases must be knowing and voluntary to be enforced. Read together, *Pierce* and *Lynch* make it clear that the federal law "knowing and voluntary" requirement in the employment discrimination context is a prerequisite to be satisfied after the existence of a binding agreement under state contract principles has been established.

*Buckley-Loda Educ. Ass'n, IEA-NEA v. Ill. Educ. Labor Relations Bd.*, 710 N.E.2d 538, 544 (Ill. App. Ct. 1999).

Dillard does not contest that the parties' oral discussions resulted in agreement on certain material terms. Instead, he argues that their oral agreement could not have been final because there were other material terms that the parties did not agree to, as evidenced by their contentious exchange of written drafts. The magistrate judge was not persuaded by this argument and held that the oral agreement was enforceable.

The magistrate judge especially emphasized Dillard's attempt to change his prior at-will employment status during the dispute over the written agreement. The court found it telling that this issue was not even mentioned during the parties' oral negotiations, though other more "mundane" details were addressed. The court held the disagreement over Dillard's at-will status was not a dispute about a material term because Dillard had always been an at-will employee of Starcon's. This reasoning is sound. The court did not abuse its discretion in holding that Dillard's belated attempt to change his at-will status was immaterial to the settlement of his case.

The magistrate judge also reasonably concluded that the other points of contention between the parties were immaterial. Terms addressing purely contingent matters are not necessarily material. *See Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1282 (Ill. App. Ct. 2002) (declaring that "[e]very feasible contingency that might arise in the future need not be provided for in a contract for the agreement to be enforceable"). Accordingly, Dillard's concern over his A-Mechanic status if he failed to pass the B-Welder exam, his attempt to permanently establish a Chicago-area work site, and his effort to revise the provision penalizing him for breaching the agreement were disputes over immaterial terms. Starcon's

proposal to prohibit Dillard from participating in investi-gations against Starcon likely would run afoul of public policy, *see* 15 CORBIN ON CONTRACTS, Ch. 83, § 83.3 (2003); Dillard's objection to this provision was thus understand-able but not a dispute over a material term that would defeat the underlying oral agreement.

Dillard raises other arguments that were not specifically addressed by the magistrate judge. First, he claims the evidence demonstrates that the parties intended to continue their negotiations after March 20. Continued negotiations *may* indicate a lack of agreement on mate-rial settlement terms, but not necessarily so. The material-ity of additional written terms introduced after an oral agreement is reached is not established simply by one party's intransigence or "refusal to budge" on the new terms. Second, Dillard cites several cases he claims support the proposition that a dispute over a written agreement undermines the enforceability of an oral agreement, but the cases are readily distinguishable from the circumstances here.

In *Quinlan*, the parties reached an oral agreement that included payment for repairs to a mutual driveway, dismissal of the plaintiff's complaint, and a system for discussing future road repairs. 823 N.E.2d at 601. The defendant claimed that the plaintiff inserted provisions in the proposed written settlement inconsistent with the parties' oral agreement. The Illinois court determined that the defendant's primary concern was having a workable agreement to settle future repair disputes. *Id.* at 604. The parties' dispute over this term in the written agreement demonstrated that they had failed to reach an accord on an essential material term of a settlement, i.e., the matter of future repairs and a mechanism for dispute resolution. *Id.* at 605. Here, in contrast, the disputed terms of Starcon's and Dillard's written agreement do not implicate the heart of their settlement; the parties' actions

do not suggest the points of dispute over the written agreement were material.

Dillard's reliance on *Higbee v. Sentry Insurance Co.*, 253 F.3d 994 (7th Cir. 2001), is also misplaced; he sweeps away critical factual differences between that case and this one. Dillard asserts that *Higbee* expressly held that confidentiality clauses, nondisparagement clauses, and release provisions are objectively material terms. *Higbee* does not so hold. The plaintiff in *Higbee* made clear during negotiations that she would not settle until the parties hammered out confidentiality and nondisparagement clauses. 253 F.3d at 998. The materiality of these terms was never in doubt. This court's decision in *Higbee* did note that many defendants would consider these terms to be among the most material in a settlement agreement. *Id.* at 997. This observation, however, was a generalization; *Higbee* does not stand for the proposition that these provisions are material as a matter of law.

For the foregoing reasons, the magistrate judge did not abuse his discretion in holding that Dillard and Starcon had a meeting of the minds on all material terms essential to their settlement. The order enforcing the oral settlement is AFFIRMED.

A true Copy:

      Teste:

 

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*